Exhibit B

## DEFAULT PREVENTION AND COLLECTION SERVICES AGREEMENT

This Default Prevention and Collection Services Agreement (hereinafter "Agreement") is entered into by and between First Marblehead Education Resources, Inc. ("FMER"), a Delaware corporation with a principal place of business at 800 Boylston St., 34th Floor, Boston, MA 02199 (together with its successors and assigns, the "Special Servicer") and NCO Financial Systems, Inc., a corporation organized under the laws of the Commonwealth of Pennsylvania having a place of business at 507 Prudential Road, Horsham, PA 19044 (together with its successors and assigns, "NCO"). This Agreement is executed as of March 1, 2009.

**WHEREAS**, FMER as the initial Special Servicer currently provides administration services to certain Delaware statutory trusts (the "Trusts") consisting of alternative student loans ("ASLs"), including the provision of default prevention and collection management services pursuant to that certain Special Servicing Agreement entered into by and among FMER as Special Servicer, U.S. Bank National Association ("U.S. Bank"), as the Back-Up Special Servicer (in such capacity, the "Back-Up Special Servicer") and the Trusts party thereto and dated as of March 1, 2009 (the "Special Servicing Agreement");

**WHEREAS**, NCO provides default prevention and collections services (the "Services") to financial institutions;

**WHEREAS**, the initial Special Servicer desires to arrange for the outsourcing of certain default prevention and collections activities to NCO as hereinafter provided in the event that the Back-Up Special Servicer becomes the Special Servicer under the Special Servicing Agreement pursuant to Section 8 of the Special Servicing Agreement; and

**WHEREAS**, NCO is willing to provide certain default prevention and collection activities as herein provided in the event that the Back-Up Special Servicer becomes the Special Servicer.

**NOW THEREFORE**, in consideration of these presents and the covenants contained herein the parties hereto hereby agree as follows:

## ARTICLE 1 - DEFINITIONS

1.1    <u>Definitions</u>

"ASL" means an education-purpose loan made by a lender pursuant to the Program Guidelines and now or formerly guaranteed by The Education Resources Institute, Inc. ("TERI"), and such other education loans as the parties may agree to in writing in the future.

"ASL Lender" means the party that originally funded an ASL purchased by a Trust.

"Attempt" means a left message for the borrower or, if applicable, and cosigner of ASL.

"Borrower Data" has the meaning set forth in Section 7.1.

"Claims Package" has the meaning set forth in Section 2.3.

"Confidential Information" has the meaning set forth in Section 7.1.

"Contact" means a telephonic discussion with the borrower and/or cosigner(s) of an ASL.

"Dedicated Staff" has the meaning set forth in Section 2.10(b).

"Default Collection Reports" means the reports set forth on Exhibit E attached hereto.

"Default Collection Services" means NCO performed default collection services as set forth on Exhibit D attached hereto, and oversight of Default Collectors under Default Collection Agreement(s).

"Default Prevention Reports" means the reports set forth on Exhibit C attached hereto.

"Default Prevention Services" means the services described in Section 2.2 and Exhibit B attached hereto.

"Early Awareness Services" means the services described in Section 2.9 and Exhibit G attached hereto.

"Governmental Authority" means the federal government of the United States, any state government, or any political subdivision of either, or any agency, court or body of the federal government of the United States, of any state, or of any other political subdivision of either, exercising executive, legislative, judicial, regulatory or administrative functions.

"Guaranty Agreement" means the document by that name between each ASL Lender and TERI.

"Program Guidelines" means the document by that name included as a part of the Guaranty Agreement.

"Requirements of Law" means, with respect to any person, any certificate of incorporation, articles of association and, as applicable, by-laws or other organizational or governing documents of such person, and any law, ordinance, statute, rule, regulation, judgment, order, decree, injunction, permit, issuance or other determination, finding, guidance or recommendation of any Governmental Authority or final and binding determination of any arbitrator applicable to or binding upon such person or to which such person is subject, whether federal, state, county or local (including, if applicable, usury laws, the federal Truth-In-Lending Act, the federal Fair Debt Collection Practices Act, the federal Equal Credit Opportunity Act, the federal Fair Credit Reporting Act, the Gramm-Leach-Bliley Act, the Telephone Consumer Protection Act, the Telemarketing and Consumer Fraud and Abuse Prevention Act, regulations of the Board of Governors of the Federal Reserve System, and regulations of the Office of Foreign Assets Control, each as amended from time to time).

"Servicers" means the Pennsylvania Higher Education Association Agency, d/b/a American Education Services; Nelnet, Inc., Edfinancial Services, LLC; ACS Education Services, Inc., Chase Student Loan Servicing LLC (f/k/a CFS SunTech Servicing LLC); and Great Lakes Higher Education Servicing Corporation.

"Services" means Default Collection Services, Default Prevention Services, Early Awareness Services and Fraud Claims Review.

"Servicing Guidelines" means the document by that name included as part of the Guaranty Agreement.

"Subservicers" means Special Servicer approved subservicers retained by NCO in conformity with the requirements of Section 2.12 of this Agreement to perform part of the Services.

# ARTICLE II - SERVICES

2.1 <u>Services Generally</u>. Special Servicer hereby retains NCO to perform the Services set forth herein in the event that, and only in the event that, Special Servicer (including for the avoidance of doubt, U.S. Bank in its capacity as successor Special Servicer) notifies NCO in writing that the Back-Up Special Servicer has assumed the duties of the Special Servicer pursuant to Section 8 of the Special Servicing Agreement. The parties acknowledge and agree that the foregoing reference to the Special Servicing Agreement is intended only as a reference to the conditions under which performance of the Services under this Agreement will begin; it is does not and shall not create duties or obligations for NCO under the Special Servicing Agreement. The parties further agree that upon U.S. Bank assuming the duties of Special Servicer under the Servicing Agreement, all references to "Special Servicer" in this Agreement shall, unless otherwise provided or the context otherwise requires, be deemed to refer to U.S. Bank acting in such capacity. The date of the beginning of the performance of services by NCO referenced in the foregoing sentence shall be the "Effective Date" for purposes of this Agreement (it being acknowledged that NCO shall commence performance of the Services set forth herein immediately upon being notified of the assumption by the Back-Up Special Servicer of the duties of the Special Servicer under the Special Servicing Agreement or such later date (if any) as shall be specified in such written notice). In order for NCO to carry out its duties under this Agreement with respect to the Services, as of the Effective Date, the initial Special Servicer shall cause the Servicers to provide to NCO (a) consumer file data in the manner and form described in Exhibit A (as amended from time to time by Special Servicer), and (b) view-only access to borrower ASL accounts on the Servicers' systems. NCO shall use such data for the purposes of performing the Services, risk modeling, providing reports as set forth in this Agreement, forecasting and billing.

2.2 <u>Default Prevention Services</u>. NCO shall perform Default Prevention Services in conformity with those Default Prevention Services set forth in Exhibit B attached hereto. NCO shall provide Dedicated Staff to make outbound calls related to accounts thirty (30) days or greater past due referred by Special Servicer and receive inbound calls resulting from NCO's efforts. NCO will also draft and mail letters and conduct other activities reasonably calculated to perform the Services.

(a) NCO shall provide reports to Special Servicer with respect to the results of Default Prevention Services performed by NCO with the frequency and having the content described in Exhibit C ("Default Prevention Reports").

(b) NCO shall perform Default Prevention Services in order to maximize "cures" of delinquent loans. "Cures" include: (i) incenting ASL borrowers who are thirty (30) days past due but less than one hundred and eighty (180) days past due to become less than thirty (30) days past due, and (ii) incenting borrowers who are one hundred and eighty (180) days past due with respect to whom the appropriate Servicer has not yet submitted a Claims Package to become less than thirty (30) days past due.

2.3 <u>Default Collection Services</u>. NCO shall perform Default Collection Services in conformity with those Default Collection Services set forth herein and in Exhibit D attached hereto. NCO shall use Dedicated Staff to perform Default Collection Services. Special Servicer shall cause the Servicers to provide to NCO all documents and information specified in the

Servicing Guidelines to make a claim under the Guaranty to TERI, other than: (i) original notes and (ii) a loan assignment to TERI (the "Claims Package").

(a)  Generally.

(i)  Special Servicer shall review the Claims Package for conformity to the Servicing Guidelines and Program Guidelines. Special Servicer shall return the Claims Package to the Servicers for further collection efforts and/or cure by the Servicers as provided in the Servicing Guidelines and Special Servicer's servicing agreement if it detects Servicer error as prescribed in the Servicing Guidelines.

(ii)  NCO shall reconcile all cash collections with its reported results of operations and transmit all cash receipts (net of the fees set forth on Exhibit H) weekly to Special Servicer. NCO shall provide the Default Collection Reports set forth in Exhibit E. NCO shall assign defaulted ASLs as needed to optimize collection.

(iii)  From time to time Special Servicer may instruct NCO with respect to collection costs, default interest rates and other adjustments to be made to account balances submitted pursuant to Special Servicer's direction by Servicers to NCO with a Claims Package ("Default Charges"). Special Servicer represents and warrants that all such Default Charges shall conform to all Requirements of Law. Any breach of the foregoing representation shall be subject of indemnification by Special Servicer under Section 8. NCO shall have no responsibility to attempt to collect any Default Charges, whether or not authorized by the ASL documents, except as instructed by Special Servicer.

(b)  Collection and Credit Reporting Services.

(i)  NCO will use all reasonable and lawful efforts to collect the full amount due on all accounts placed with it by Special Servicer for collection. Special Servicer may place with NCO various First, Second and Third Placements, as defined in Exhibit D attached hereto and incorporated herein. The full amount due on each account will consist of principal; accrued interest; late fees, if any; and any collection costs and attorneys' fees awarded by a court of competent jurisdiction pursuant to a final judgment and recoverable under the terms of the loan agreement, as well as extrajudicial collection costs recoverable under applicable law. NCO will keep full and accurate records of all borrower Contacts and other collection activity. NCO may negotiate and revise any borrower's repayment schedule in any manner approved in writing by an authorized representative or agent of Special Servicer. NCO may not reduce the amount due on any account, or otherwise decrease the borrower's aggregate obligation on the account, without specific prior written consent of an authorized representative or agent of Special Servicer, except as expressly set forth in this Agreement.

(ii)  NCO will report the status of each post-default account whenever placed to the three national credit reporting agencies currently known as Equifax, TransUnion and Experian (f/k/a TRW), subject to the provisions of Article V. Reporting the status of an account shall include reporting the status with respect to all co-debtors.

(iii)  Special Servicer reserves the right to restrict or otherwise limit at any time, from time to time, the manner or means to be used by NCO in collecting any account, which restrictions may be communicated to NCO by Special Servicer orally or in writing, at Special Servicer's sole discretion.

(c)     Source and Timing of Fee Payments. Notwithstanding the fee provisions set forth in Article III, fees due NCO for Default Collection Services, including costs and expenses related to litigation, will be paid on a loan-by-loan basis out of funds held in the Account (as defined in Section 2.6).  Fees will be billed weekly and NCO may withdraw billed fees from the Account at such time (i.e., weekly) as it forwards the Account balances to Special Servicer.

2.4     Litigation Management.  As part of the Default Collection Services, NCO shall administer collection litigation as described in this section and in Exhibit D attached hereto. Special Servicer may also from time to time designate loans as to which assessment and recovery of collection costs from the borrower in an extrajudicial context are allowed by applicable law, by way of contract or otherwise.  NCO will use all reasonable and lawful efforts to collect such collection costs as directed by Special Servicer.

NCO may, with Special Servicer's prior written approval, forward accounts for litigation to an attorney licensed to practice law in the applicable jurisdiction and acceptable to Special Servicer. NCO will handle all routine communication with the attorney on Special Servicer's behalf and will be responsible for monitoring the attorney's performance in litigating the case, collecting on the accounts pre-judgment and collecting on any judgment or settlement.  Except in the case where there is no media availability, any decision regarding settlement, dismissal of the action, or the removal of an attorney will require Special Servicer's written consent.  Special Servicer recognizes that back up media, sworn statements of account, affidavits and other documentation may be required to pursue legal treatment on accounts placed with NCO. In the event that documentation is required, Special Servicer will comply with NCO's request for media and follow request procedures as agreed upon in work standards. If Special Servicer can not comply with media or documentation requests within a fourteen (14) day period, NCO reserves the right to dismiss any legal action, with our without prejudice and close and return the account back to Special Servicer. In the event that lack of media or documentation results in liability for NCO or Special Servicer, Special Servicer bears the burden of indemnification. At all times, Special Servicer and not NCO will be the client of the collection attorney.  Special Servicer agrees promptly to provide all available documentation, written testimony, witnesses and other reasonably necessary materials and assistance requested by NCO in support of such litigation.

(a)     NCO shall be responsible for selecting and directly supervising collection attorneys.  NCO will submit lists of collection attorneys used by NCO to Special Servicer, and Special Servicer may, at any time, prohibit the submission of new litigation files to an attorney on its behalf.

(b)     All collection attorneys shall be paid by NCO and Special Servicer shall have no obligation to pay such attorneys.

(c)     NCO will provide evidentiary support for collection attorneys, including basic factual orientation, copies of documents, records of account balances, affidavits and testimony, as reasonably required.  Special Servicer will instruct Servicers to provide original documents to NCO upon request from NCO.  For this purpose, Special Servicer on behalf of the Trusts hereby appoints NCO as keeper of the applicable Trust's  records of all ASLs that are the subject of NCO administration.

(d)     NCO shall supervise the progress of collection litigation and review the progress of their assigned litigation quarterly. Such review shall include the establishment and prosecution of appropriate post-judgment enforcement, to the extent lawful.

(e)     NCO may compromise ASL claims in exchange for immediate payment of ███████████████████ of all outstanding principal, interest and other amounts due to Special Servicer. Additional settlement authority given to NCO, if any, is described in Exhibit F, attached hereto. Special Servicer agrees to designate a business contact with authority to review and approve collection settlement proposals with NCO.

(f)     NCO shall promptly transmit to Special Servicer any pleadings or other documents it receives relating to counterclaims naming Special Servicer or any Trust in collection litigation. Upon request, NCO shall assist Special Servicer with respect to management of counterclaims naming Special Servicer or any Trust as a party, including management of local counsel in consultation with Special Servicer.

(g)     All court costs and related expenses, including hourly billing charges, incurred in connection with a legal proceeding shall be paid as set forth in Section 2.3(c). For audit and reconciliation purposes, NCO shall itemize costs for each borrower and the amount and purpose of each expense. Special Servicer will not advance the pre-payment of such costs, and will only reimburse costs that have actually been incurred. The attorney must receive Special Servicer's or NCO's prior written approval before incurring any expense (other than a filing fee, process server fee, or other court cost) in excess of $500.

2.5     Special Accounts.

(a)     In the event any debtor with respect to any ASL that is the subject of Services becomes a debtor under the U.S. Bankruptcy Code, NCO shall immediately cease all Services and submit the file to Special Servicer unless Special Servicer otherwise directs in writing.

Special Servicer undertakes that it will not send to NCO accounts for collection on any indebtedness that it has reason to believe are subject to any bankruptcy proceeding and that it will indemnify and hold harmless NCO from any and all claims and legal actions asserted against NCO, and all money damages and legal costs incurred by NCO, to the extent that the same result solely from Special Servicer's failure to observe such requirement.

(b)     In the event any debtor with respect to any ASL that is the subject of Services is deceased, NCO may accept from the Servicers the documentation specified under "Death Claim" under the Servicing Guidelines and may collect the ASL.

2.6     Special Servicer Funds Account. NCO will credit all funds received from debtors into an FDIC-insured trust fund account (the "Account") for Special Servicer in trust for the benefit of each Trust, which will segregate said funds from NCO's own funds and from the funds of all other NCO clients. Any interest earned on the Account will be forwarded to Special Servicer twice annually at a time Special Servicer directs, or upon reasonable notice by Special Servicer. For purposes of this Agreement and except as set forth in this Agreement, the funds in the Account will be the sole property of Special Servicer in trust for each Trust, and NCO will have no right to pay such funds to any person other than Special Servicer except as specifically authorized in this Agreement. NCO will remit to Special Servicer on a weekly basis on a specified day of every week (or at different periodic intervals chosen by Special Servicer), by

wire transfer to a Special Servicer-designated account, all funds in the Account representing payments received by NCO for the previous week (or alternative periodic interval chosen by Special Servicer), except fees owed to NCO for Default Collection Services (which shall be payable to NCO as set forth in Section 2.3(c)). NCO will submit a report with such wire, described more fully in Exhibit E attached hereto. Special Servicer will promptly notify NCO of any payment that Special Servicer receives directly from a debtor whose account has been assigned to NCO, and will promptly remit to NCO the fee due to NCO with respect to such payment.

2.7    Tax Reporting. NCO shall provide on Special Servicer's behalf all tax reporting required under the federal Internal Revenue Code on defaulted ASLs serviced hereunder, including but not limited to reporting required under sections 1098 and 1099 thereof.

2.8    Early Awareness Services.

(a)    NCO shall perform Early Awareness Services in conformity with those Early Awareness Services set forth herein and in Exhibit G attached hereto. NCO shall use Dedicated Staff to develop and carry out a "Borrower Repayment Education And Counseling" program for borrowers about to enter repayment. The specific objective of this program is to educate borrowers of upcoming payment requirements and advise borrowers, if authorized under the circumstances, of the existence of deferment, forbearance and modified graduated repayments ("MGRS") alternatives under applicable Program Guidelines, to reduce the number and percentage of borrowers becoming subsequently delinquent in the repayment process.

(b)    The purpose of each borrower Contact will be to:

(i)    Remind borrowers of upcoming payment requirements.

(ii)    Get "commitment/promise" from borrowers that they are prepared and intend to meet their payment requirements (for example, by signing up for ACH repayment).

(iii)    Identify borrowers who may have concerns about ability to meet payment requirements.

(iv)    Advise borrowers, only if authorized under the circumstances, of the existence of deferment, forbearance and modified graduated repayments MGRS alternatives under existing Program Guidelines.

(c)    NCO hereby acknowledges that (i) the Servicing Guidelines articulate the specific circumstances under which NCO may advise borrowers of each of the deferment, forbearance and MGRS alternatives; (ii) it is Special Servicer's objective to maximize the number and percentage of borrowers entering repayment as scheduled, (iii) borrowers will be advised of the deferment, forbearance and MGRS alternatives only in accordance with the Servicing Guidelines, and (iii) nothing in this Agreement shall be construed to authorize NCO to offer, provide or enroll borrowers in deferment, forbearance or MGRS alternatives except as set forth in the Servicing Guidelines.

2.10    Staffing. NCO represents and warrants the following with regard to all staff providing the Services to Special Servicer:

(a)    NCO's employees and/or agents are adequately trained to perform the Services with reasonable diligence, in a professional manner, and in compliance with any and all applicable laws and regulations and that NCO's Services will be in compliance with Federal,

state, and local laws, rules and regulations as now in effect and as amended from time-to-time to the extent they are applicable to the subject matter of this Agreement.

(b)     NCO shall provide staffing through its employees and other personnel to Special Servicer (the "Dedicated Staff"). The Dedicated Staff shall only work on Special Servicer ASLs and will perform the Services as directed by the Special Servicer.

(c)     Except as provided Section 2.11 ("NCO Personnel") hereof, NCO shall be responsible for all aspects of providing the Dedicated Staff to perform the Services, including staffing selection, hiring, firing, supervision, and disciplinary procedures, and NCO shall be responsible for all wages, salaries, benefits, workers compensation, unemployment compensation and other amounts due to the Dedicated Staff as well as the withholding of applicable taxes, FICA, and FUTA, provided, however, that nothing contained herein shall be deemed to limit Special Servicer overall management and supervision of the Dedicated Staff and other NCO personnel as more particularly described herein below.

(d)     NCO shall provide the Dedicated Staff at levels mutually agreed upon by Special Servicer and NCO.

(e)     NCO is solely responsible for all aspects of training the Dedicated Staff to perform the Services as required under this Agreement, including training in connection with the Special Servicer's policies and procedures.

(f)     NCO shall be responsible for providing all office and clerical supplies and equipment (fax machines, headsets, copiers, copy paper, pens, forms, etc.) as well as workstation computers, telecommunications all other equipment, materials and furniture necessary to perform the Services.

(g)     NCO will provide management personnel to support the Dedicated Staff required under this Agreement.

2.11     NCO Personnel.

(a)     NCO's employees are not eligible to participate in any of the employee benefit or similar programs of Special Servicer. NCO shall inform all of its employees providing Services pursuant to this Agreement that they will not be considered employees of Special Servicer for any purpose, and that Special Servicer shall not be liable to any of them as an employer for any claims or causes of action arising out of or relating to their assignment.

(b)     Upon the request of Special Servicer for reasonable cause, NCO shall immediately remove any of NCO's employees or Subservicers performing Services under this Agreement at Special Servicer's premises and replace such employee or Subservicer as soon as practicable. Upon the request of Special Servicer, NCO shall promptly, and after consultation with Special Servicer, address any concerns or issues raised by Special Servicer regarding any of NCO's employees or Subservicers performing Services under this Agreement at premises other than Special Servicer premises, which may include, as appropriate, removing such employee or Subservicer from the Special Servicer account.

(c)     NCO shall comply and shall cause its employees and any Subservicers to comply with all personnel, facility, safety and security rules and regulations and other instructions of Special Servicer provided to NCO, its employees or Subservicers, as applicable, in writing, when performing work at a Special Servicer facility, and shall conduct its work at

Special Servicer facilities in such a manner as to avoid endangering the safety, or interfering with the responsibilities of, Special Servicer employees or customers. NCO understands that Special Servicer operates under various laws and regulations that are unique to the security-sensitive financial services industry. As such, persons engaged by NCO to provide Services under this Agreement are held to a higher standard of conduct and scrutiny than in other industries or business enterprises. NCO agrees that its employees and Subservicers providing Services hereunder shall possess appropriate character, disposition and honesty.

(d)     NCO shall not knowingly permit any of its employees or any Subservicer to have access to the Confidential Information, premises, records or data of Special Servicer or any Trust when such employee or Subservicer: (i) has been convicted of a crime or has agreed to or entered into a pretrial diversion or similar program in connection with: (A) a dishonest act or a breach of trust, as set forth in Section 19 of the Federal Deposit Insurance Act, 12 U.S.C. 1829(a); or (B) a felony; or (ii) uses illegal drugs. Notwithstanding anything in this Agreement to the contrary, NCO shall conduct background checks on its employees and those of its Subservicers who will have access (whether physical, remote, or otherwise and whether on or off Special Servicer premises) to Confidential Information or Special Servicer facilities, equipment, systems or data. Such background checks must include, at a minimum the following: (i) the search of such person's social security number to verify the individual's identity and current and previous addresses; (ii) a criminal background search of all court records in each venue of such person's current and previous address over the past five (5) years; (iii) a minimum of one (1) confirmed work reference prior to assignment at NCO; and (iv) the validation of United States citizenship or certification to work in the United States. Additional requirements may be specified by Special Servicer from time to time. NCO shall report to Special Servicer the results of all background checks prior to such employee or Subservicer being granted such access or performing Services hereunder.

(e)     Unless this Agreement specifically provides otherwise, all Services must be performed in the United States (or, with respect to borrowers who are residents of Canada, in Canada) and all Confidential Information must be stored, maintained, accessed from, and utilized only in the United States (or, with respect to borrower who are residents of Canada, in Canada). In the event that NCO employs non-U.S. citizens to provide services hereunder, NCO shall ensure that all such persons have and maintain appropriate visas to enable them to provide the Services.

(f)     Special Servicer shall notify NCO of any act of dishonesty or breach of trust committed against Special Servicer, which may involve an employee or Subservicer of NCO of which Special Servicer becomes aware, and NCO shall notify Special Servicer if it becomes aware of any such offense. Following such notice, at the request of Special Servicer and to the extent permitted by law, NCO shall cooperate with investigations conducted by or on behalf of Special Servicer.

(g)     All employees and Subservicers of NCO performing Services or supporting NCO activities under this Agreement, regardless of their location, shall be validated by NCO to not be on any list published and maintained by the Government of the United States of America of persons or entities with whom any U.S. person or entity is prohibited from conducting business. Currently, the lists of such persons or entities can be found on the following web sites:

i.      Denied Persons List on the Bureau of Industry and Security at http://www.bis.doc.gov/dpl/default.shtm.

ii.     The Specially Designated Nationals and Blocked Persons List of the Office of Foreign Assets Control – Department of Treasury at http://www.ustreas.gov/offices/enforcement/ofac/sdn/index.html.

NCO shall conduct periodic reviews, no less frequently than quarterly, of the lists mentioned above. NCO shall report to Special Servicer immediately if the name of any NCO employee or Subservicer performing the Services matches with the name of any person listed on any list published by the Government of the U.S. of persons or entities with whom any U.S. person or entity is prohibited from doing business.

(h)     Special Servicer shall provide notice to NCO of any changes in Dedicated Staff levels by the 15th of every month for changes to be effective on the lst of the following month; provided that Special Servicer shall provide NCO with a minimum of thirty (30) days advance notice of any change involving more than ten percent (10%) of the total Dedicated Staff.

2.12    <u>Subservicers</u>. NCO shall not retain any Subservicer to provide Services under this Agreement without first providing advance written notice to Special Servicer; provided, however, NCO shall not permit any Subservicer to have access to Confidential Information, including Borrower Data, without first providing to Special Servicer at least ten (10) days advance written notice of the identity, qualifications, and general proposed activities of such proposed Subservicer. Special Servicer may object to the selection of such proposed Subservicer during said ten (10) day period, in which case NCO shall meet with Special Servicer to discuss Special Servicer's objections and will not retain such Subservicer without Special Servicer's written consent. If Special Servicer does not object within the then (10) day period, Special Servicer shall be deemed to have approved such proposed Subservicer for all purposes disclosed to Special Servicer in the applicable notice from NCO. Any consent by Special Servicer to the engagement of a Subservicer under this Section 2.12 shall not relieve NCO of any of its obligations under this Agreement. NCO shall be responsible for the performance or nonperformance of its Subservicers as if such performance or nonperformance were that of NCO. Notwithstanding the foregoing, the entities listed on Schedule 2.12 attached hereto shall be deemed approved Subservicers hereunder.

## ARTICLE III – FEES FOR SERVICES

3.1     <u>Fees for Services</u>. In consideration of the Services, Special Servicer shall pay to NCO the fees set forth in Exhibit H. NCO shall invoice Special Servicer monthly as of the last date of each month. With the exception of fees due for Default Collection Services which are set forth in Section 2.3(c) herein, invoices shall be due within thirty (30) days after invoice date. NCO may submit invoices electronically in a mutually agreed format. Any amount not subject to a bona fide dispute and unpaid more than thirty (30) days after invoice date shall be subject to a late fee of one and one-half percent (1.5%) per month until paid in full. Monthly invoices shall be accompanied by a loan level report in a format mutually acceptable to NCO and Special Servicer enabling Special Servicer to reconcile the invoice with the services provided.

3.2     <u>Expenses</u>. NCO will bear all its own expenses in connection with its services hereunder. No thing or service costing more than one hundred dollars ($100.00) will be purchased in regard to any account without prior written approval of an authorized representative

or agent of Special Servicer, except for required court costs which are paid by Special Servicer as set forth in Section 2.3(c) herein.

## ARTICLE IV - REPRESENTATIONS AND WARRANTIES

4.1     Representations and Warranties of Special Servicer.  Special Servicer hereby represents and warrants to NCO as follows:

(a)     Organization.  It is a national banking association organized, validly existing and in good standing under the laws of the United States and has full power and authority to conduct its business as it is presently being conducted.

(b)     Authorization.  It has all necessary corporate authority and has taken all necessary corporate action to enter into this Agreement, to consummate the transactions contemplated hereby and to perform its obligations hereunder.  This Agreement has been duly executed and delivered by Special Servicer and is a legal, valid and binding obligation of Special Servicer, enforceable against it in accordance with its terms, except as the enforcement thereof may be limited by applicable bankruptcy, insolvency, rearrangement, reorganization or similar debtor relief legislation affecting the rights of creditors generally from time to time in effect and by general principles of equity (regardless of whether such enforcement is sought in a proceeding at law or in equity) and the discretion of the court before which any proceeding therefor may be brought.

(c)     Absence of Conflicts.  Neither the execution and delivery of this Agreement by Special Servicer nor the performance by Special Servicer of its obligations hereunder will result in (i) a violation of the articles of association of Special Servicer, (ii) a breach of, or a default under, any contract, agreement, instrument, lease, commitment, franchise, license, permit or authorization to which Special Servicer is a party or by which it or its assets are bound, which breach or default would have a material adverse effect on its business or financial condition or its ability to consummate the transactions contemplated hereby, or (iii) a violation by Special Servicer of any Requirements of Law, which violation would have a material adverse effect on Special Servicer's business or financial condition or its ability to consummate the transactions contemplated hereby.

(d)     Consents and Approvals.  Special Servicer has obtained any and all consents, approvals or authorizations of, and made any and all declarations, filings or registrations with, any Governmental Authority, or any other Person, required to be obtained or made by Special Servicer in order to execute, deliver and perform its obligations under this Agreement or consummate the transactions contemplated hereby, except where the failure to do so would not have a material adverse effect on its business or financial condition or its ability to consummate the transactions contemplated hereby.  Special Servicer represents that it is fully authorized and empowered to refer accounts to NCO for Services.  Special Servicer represents that any interest or additional charges added to any account by Special Servicer, or which Special Servicer directs NCO to add, are authorized by contract or are otherwise authorized by law.

(e)     Litigation.  There is no action, order, writ, injunction, judgment or decree outstanding or claim, suit, litigation, proceeding, labor dispute, arbitral action or investigation pending, or to the actual knowledge of Special Servicer threatened, against or relating to Special Servicer that would have a material adverse effect on this Agreement or on Special Servicer's ability to consummate the transactions contemplated hereby.

(f)  Accounts. With respect to Default Collection Services, Special Servicer undertakes that it will not send to NCO accounts for collection on any indebtedness that it has reason to believe are subject to any bankruptcy proceeding and that it will indemnify and hold harmless NCO from any and all claims and legal actions asserted against NCO, and all money damages and legal costs incurred by NCO, to the extent that the same result solely from Special Servicer's failure to observe such requirement

4.2  Representations and Warranties of NCO. NCO hereby represents and warrants to Special Servicer as follows:

(a)  Organization. It is duly organized, validly existing and in good standing under the laws of the Commonwealth of Pennsylvania, and has full corporate power and authority to conduct its business as it is presently being conducted.

(b)  Authorization. It has all necessary corporate authority and has taken all necessary corporate action to enter into this Agreement to consummate the transactions contemplated hereby and to perform its obligations hereunder. This Agreement has been duly executed and delivered by NCO and is a legal, valid and binding obligation of NCO, enforceable against it in accordance with its terms, except as the enforcement thereof may be limited by applicable bankruptcy, insolvency, rearrangement, reorganization or similar debtor relief legislation affecting the rights of creditors generally from time to time in effect and by general principles of equity (regardless of whether such enforcement is sought in a proceeding at law or in equity) and the discretion of the court before which any proceeding therefor may be brought.

(c)  Absence of Conflicts. Neither the execution and delivery of this Agreement by NCO nor the performance by NCO of its obligations hereunder will result in (i) a violation of the articles of incorporation or charter documents of NCO, (ii) a breach of, or a default under any contract, agreement, instrument, lease, commitment, franchise, license, permit or authorization to which NCO is a party or by which it or its assets are bound, which breach or default would have a material adverse effect on its business or financial condition or its ability to consummate the transactions contemplated hereby, or (iii) a violation by NCO of any Requirements of Law, which violation would have a material adverse effect on NCO's business or financial condition or its ability to consummate the transactions contemplated hereby.

(d)  Consents and Approvals. NCO has obtained any and all consents, approvals or authorizations of, and made any and all declarations, filings or registrations with, any Governmental Authority, or any other person, required to be obtained or made by NCO in order to execute, deliver and perform its obligations under this Agreement or consummate the transactions contemplated hereby, except where the failure to do so would not have a material adverse effect on its business or financial condition or its ability to consummate the transactions contemplated hereby.

(e)  Litigation. There is no action, order, writ, injunction, judgment or decree outstanding or claim, suit, litigation, proceeding, labor dispute, arbitral action or investigation pending, or to the actual knowledge of NCO threatened, against or relating to NCO that would likely have a material adverse effect on this Agreement or on NCO's ability to consummate the transactions contemplated hereby.

(f)  Best Efforts. NCO will utilize its best efforts and competence in rendering services and in performing its duties hereunder and shall not use any method prohibited by

federal, state or local laws, regulations or procedures, including but not limited to any applicable consumer protection or bankruptcy laws, regulations or procedures in collecting the account balances. . NCO has not, does not and will not represent, warrant, or guarantee the collections or timing of any collections of any accounts assigned to it under this Agreement. Also, NCO will not conduct its business in a manner calculated or reasonably expected to result in unfavorable public opinion or notoriety to Special Servicer, Special Servicer or any Trust or to result in litigation being threatened or instituted against Special Servicer, Special Servicer or any Trust. NCO will promptly give oral and written notice to Special Servicer of any federal, state or local administrative or court proceeding affecting NCO or any of its officers, agents, servants or employees in the collection of Special Servicer's accounts.

(g)     Legal Proceedings. In the event of any lawsuit in which counterclaims are interposed by a debtor, or where a debtor shall make any other claim against Special Servicer or any Trusts, the same shall be immediately referred by NCO to Special Servicer and Special Servicer shall have the right to intercede and defend such action. No criminal proceedings, real property executions, bailable attachments, commitment orders or other enforcement proceedings, except for the issuance of a subpoena to examine the debtor and restraining notices, shall be instituted by NCO without prior written approval of Special Servicer.


## ARTICLE V - GENERAL COVENANTS OF THE PARTIES

5.1     Compliance With Requirements of Law. NCO and Special Servicer each shall comply with all applicable Requirements of Law in performing its respective obligations under this Agreement.

(a)     Collection Practices. NCO warrants and represents that it has special knowledge and skills necessary to perform collection services properly, and has trained its employees to use such knowledge and skills in the performance of such services. NCO further warrants and represents that its performance of its obligations hereunder, including but not limited to its collection and credit reporting practices, will fully comply with all applicable Requirements of Law, and any and all rules of conduct required by Special Servicer from time to time. NCO shall keep itself fully informed regarding existing and pending legislation and regulatory rule-making or other action relating to collection and credit reporting practices and procedures.

(b)     Licensing. NCO warrants that it will maintain in full force and effect all licenses required under Applicable Law for the conduct of all activities contemplated by this Agreement and comply with all Requirements of Law relative to its licenses. NCO will furnish Special Servicer with copies of such licenses on request.

(c)     Records. NCO warrants that it will maintain all records required of it under any Requirements of Law. It will furnish copies of all such records to Special Servicer upon request.

5.2     Insurance, etc. NCO warrants that it will maintain all insurance, bonds, capital reserves, and the like that may be required of it under any Requirements of Law. NCO will provide Special Servicer with satisfactory evidence thereof upon request.

(a)     Special Servicer will notify NCO of any facts known to it concerning a

particular loan that may limit the collection activities that NCO can undertake with respect to such loan, such as, without limitation, the fact that the borrower has notified Special Servicer that he or she has retained counsel.

(b)     NCO shall, at all times and at NCO's cost and expense, keep in full force and effect the following insurance coverages with insurers that have ratings from A.M. Best of not less than "A" or a comparable rating from another nationally recognized rating agency reasonably acceptable to Special Servicer:

i.     Employee dishonesty coverage at a limit not less than $1,000,000 per occurrence, insuring against theft or misappropriation of money or Confidential Information of any affiliate or subsidiary of Special Servicer or any Trust for which NCO may be held legally liable;

ii.     Professional liability/errors and omissions liability coverage at a limit not less than $1,000,000 per occurrence, extending to Special Servicer, any affiliate or subsidiary of Special Servicer or any Trust as additional insureds, insuring against claims for loss attributable to wrongful acts of NCO, including wrongful acts of NCO's employees, in the performance of Services under this Agreement;

iii.     Commercial general liability coverage on an occurrence basis, including bodily injury liability, property damage liability, personal injury liability, and contractual liability coverages, extending to Special Servicer, any affiliate or subsidiary of Special Servicer or any Trust as additional insureds, with respect to claims arising from NCO's operations in connection with this Agreement, at a combined single limit not less than $1,000,000 per occurrence and combined annual aggregate liability limit of not less than $2,000,000;

iv.     Business automobile liability coverage for claims of bodily injury or property damage arising from the operation of vehicles owned, leased, hired or borrowed by NCO or on NCO's behalf in connection with Services performed under this Agreement, at a combined single limit not less than $1,000,000 per occurrence;

v.     Workers' compensation coverage providing statutory benefits as required in any and all jurisdictions where Services will be performed under this Agreement;

vi.     Employer's liability coverage, extending to Special Servicer, any affiliate or subsidiary of Special Servicer or any Trust as additional insureds, at limits not less than $1,000,000 per accident for injury by accident, and $1,000,000 per employee and in the aggregate for injury by disease;

vii.     Umbrella or excess liability coverage, extending to Special Servicer, any affiliate or subsidiary of Special Servicer or any Trust as additional insureds, at a limit not less than $4,000,000 per occurrence, which is to apply in excess of the commercial general liability, business automobile liability and employer's liability coverages identified in subparts (iii), (iv) and (vi) of this Paragraph 23(a).

(c)     <u>Evidence of Insurance</u>.  NCO shall provide Special Servicer with certificates of insurance providing evidence of all these required coverages prior to the commencement of Services under this Agreement, and thereafter upon the renewal or replacement of any of the policies.  Said certificates shall identify significant policy exclusions that would have a bearing upon the Services provided under this Agreement.

# ARTICLE VI - BOOKS AND RECORDS; AUDIT RIGHTS

6.1     Maintenance of Books and Records.  NCO will keep proper books and records reflecting all of its business affairs and transactions so that its financial statements, consolidated with its affiliates, are in accordance with GAAP.  NCO shall maintain its books and records relating to activities under this Agreement throughout the term hereof and thereafter for such periods as are required under applicable Requirements of Law or NCO's policy, whichever is longer.

6.2     Audit Rights.

(a)     Special Servicer shall have the right to review, inspect and audit, at Special Servicer's expense, once each calendar year (or more than once in a calendar year in the event that Special Servicer requires the review, inspection or audit in order to respond to a court order, civil investigation demand or other government or regulatory agency inquiry), the books and records of NCO related to: (i) NCO's activities hereunder or (ii) conformance with NCO's obligations hereunder.

(b)     No later than thirty (30) days prior to the commencement of any review, inspection or audit, Special Servicer shall provide to NCO written notice of its intent to perform a review, inspection or audit, which notice shall include in reasonable detail the scope thereof and the supporting documentation to be requested.  Within fifteen (15) days of receipt of any such notice, NCO shall notify Special Servicer, in writing of any objections to the scope of the review, inspection or audit or the supporting documentation requested, it being understood that any objections of NCO must be based upon a reasonable and documented belief that such review, inspection, audit or documentation is not reasonably related to NCO's obligations under this Agreement or would require the disclosure of proprietary information (other than information that is proprietary solely as a result of this Agreement).  Special Servicer and NCO shall cooperate in good faith to resolve objections with respect to any review, inspection or audit proposed by Special Servicer and such review, inspection or audit shall not commence until such objections are resolved.  In the event the parties are not able to resolve such objections, the matter shall be resolved in accordance with the procedures set forth in Section 11.2.

(c)     Any review, inspection or audit to be performed by Special Servicer pursuant to this Section 6.2 shall be conducted only during normal business hours and with reasonable advance notice, using reasonable care not to cause damage and not to interrupt the normal business operations of NCO.

(d)     NCO will engage, at its sole expense, an unrelated American Institute of Certified Public Accountants ("AICPA") certified public accounting firm acceptable to Special Servicer to conduct reviews of NCO's general controls and practices associated with NCO's facilities and Subservicers facilities engaged in providing Services, as well as the controls associated with the services and the programs used to provide Services.  The scope of the audit shall include all such matters as NCO's auditor deems necessary or required to meet regulatory compliance standards, including but not limited to an examination of the record keeping system and other equipment and software used by NCO.  Such reviews shall be performed at such frequency and times as NCO shall determine, but shall be performed at least once annually.  Within thirty (30) days of its receipt by NCO, NCO shall provide Special Servicer with a copy of each report and the related working papers submitted by NCO's independent accountants regarding any of the matters set forth in this paragraph.  All such reviews shall comply with

AICPA SAS-70 standards or equivalent thereof, and the reports obtained shall be of the type generally referred to (depending on the publication) as either type "2" or "B", and shall include an unqualified opinion on the operating effectiveness of NCO's controls. All such reviews shall also comply with Security Standards Certification ISO 17799/BS7799 or equivalent thereof. If a SAS 70 or equivalent audit reveals that the services provided by NCO do not cause NCO's operations to meet the auditor's recommendation, then NCO shall promptly provide such further services as are necessary to bring its operations into conformance with the auditor's recommendations to such level and degree, at no cost to Special Servicer.

    6.3    <u>Regulatory Agency Requirements.</u>

    (a)    NCO understands and acknowledges that Special Servicer may be subject to examination by any federal, state or local governmental or quasi-governmental officials with regulatory authority over Special Servicer and its affiliates. NCO agrees to cooperate fully with any examination or inquiry by any such officials or other regulatory body or agency. NCO further acknowledges that Special Servicer, as a regulated financial institution, is required to engage in ongoing oversight of its relationship with NCO, including, but not limited to, reviewing NCO's compliance with privacy laws and regulations, insurance coverage, and performance under this Agreement. NCO agrees to notify Special Servicer promptly in writing in the event it experiences any material adverse change, including but not limited to, material financial difficulty, other catastrophic event, material change in strategic goals, or significant staffing changes relative to its obligations under this Agreement.

    (b)    Within thirty (30) days of its receipt, to the extent NCO is permitted to do so, NCO shall provide Special Servicer with a copy of the results of any audit performed by a federal, state or local regulator, but only to the extent such audit relates to compliance by NCO with applicable law and to the Services performed by NCO for Special Servicer hereunder. If such audit reveals that the Services provided by NCO do not cause NCO's operations to meet the auditor's recommendation, then NCO shall provide such further Services as are necessary to bring its operations into conformance with the auditor's recommendations to such level and degree, at no cost to Special Servicer.

## **ARTICLE VII - CONFIDENTIALITY**

    7.1    <u>Confidentiality</u>. NCO acknowledges and agrees that all information provided to NCO by Special Servicer is considered confidential or proprietary and is provided to NCO solely to enable NCO to perform the Services and related functions set forth in Article II of this Agreement. For purposes of this Agreement, "Confidential Information" of Special Servicer means all confidential or proprietary information and documentation and data (whether technical, commercial or other in nature) of such party, whether or not marked as such and/or whether now in existence or hereafter created including, without limitation all Borrower Data and any other Trust data. For purposes of this Agreement, "Borrower Data" means any and all data and information of any kind or nature provided to NCO by or on behalf of Special Servicer or arising out of or in connection with this Agreement with respect or relating in any way to borrowers individually or in the aggregate. NCO shall hold the Confidential Information of Special Servicer in confidence and shall not disclose nor use such Confidential Information other than for the purposes contemplated by this Agreement without prior written consent of Special Servicer. Notwithstanding any provision in this Agreement to the contrary, NCO shall limit the use and circulation of such information, even within its own organization, solely to the extent

necessary to perform its obligations under this Agreement. Confidential Information shall not include information that: (i) has been disclosed in the public domain prior to the date hereof; (ii) becomes, through no fault nor action of either party, hereafter disclosed in the public domain; (iii) is now or comes into the possession of NCO without any obligation of confidentiality. Special Servicer acknowledges that NCO and/or its affiliates may have legitimately obtained Borrower Data through prior relationships and that such data is held under restrictions arising out of such relationships and not under this Agreement. In addition, the substance of the negotiations of this Agreement and the terms of this Agreement are Confidential Information subject to the restrictions contained in this Agreement. NCO shall not be considered to have breached its obligation by disclosing Confidential Information of the Special Servicer in response to the order of any competent court or governmental agency; provided, however, that upon receipt of such order, NCO shall promptly provide to the Special Servicer notice of such request to enable the Special Servicer to seek an appropriate protection order or take other action to assure the confidential handling of the Confidential Information. All such Confidential Information shall remain the exclusive property of Special Servicer.

7.2     Restricted Use. NCO agrees not to utilize any Confidential Information, unless it is necessary to do so in order to fulfill an obligation under this Agreement. NCO also agrees that it will not sell, disclose, transfer, or rent any Confidential Information to any third party nor will it use any Confidential Information on behalf of any third party, without the express written permission of Special Servicer. NCO shall provide all notices and perform all other activities required of it to comply with the Gramm-Leach-Bliley Act and regulations promulgated thereunder and any other applicable federal, state and local privacy laws in connection with the Confidential Information received in connection with this Agreement.

7.3     Injunctive Relief. NCO acknowledges that money damages may be both incalculable and an insufficient remedy for any breach of this provision by NCO and that any such breach may cause Special Servicer, the Trusts and others irreparable harm. Accordingly, NCO agrees that in the event of any breach of this Article VII, Special Servicer or any Trust, in addition to any other remedies at law or in equity that it may have, shall be entitled without requirement of posting a bond or other security, to equitable relief, including injunctive relief and specific performance without proof of actual damages.

7.4     Information Protection and Security.

(a)     NCO may receive or otherwise have access to Borrower Data in connection with providing Services to Special Servicer pursuant to the terms of the Agreement. NCO shall implement and maintain an appropriate security program for Borrower Data designed to meet the following Objectives (defined below) of the Interagency Guidelines Establishing Standards for Safeguarding Customer Information pursuant to the authority of Section 501(b) of the Gramm-Leach-Bliley Act of 1999. "Objectives" means a program designed to (i) ensure the security and confidentiality of Borrower Data; (ii) protect against any anticipated threats or hazards to the security or integrity to Borrower Data, and (iii) protect against unauthorized access to or use of Borrower Data that could result in substantial harm or inconvenience to any Special Servicer or any borrower. NCO shall provide Special Servicer on or prior to the Effective Date and thereafter, upon request, with a copy of its Information Security and Assurance Policy and any updates or amendments thereto. NCO agrees that upon reasonable notice and at NCO's convenience, Special Servicer or any agent or representative thereof may come to NCO's place of business and review the specifics of NCO's security plan with NCO. It is understood and

agreed that NCO shall not be required to have a security program in place that implements every security measure listed in each paragraph of Section III C of Appendix A to 12 CFR § 30 provided that NCO's security program is appropriate to address the level of risk and otherwise meets the Objectives. Special Servicer, its internal and external auditors and regulatory agencies ("Auditors") shall be permitted, during normal business hours, to audit NCO's security program upon provision of reasonable prior notice and provision of an agenda for the audit requirements. NCO shall be subject to said audits as long as NCO continues to maintain, store or have access to Borrower Data.

(b)     NCO presently maintains and agrees it will continue to maintain appropriate physical, electronic, procedural and technical safeguards to protect all Borrower Data from unauthorized disclosure, misuse, alteration, destruction or other compromise that are consistent with appropriate industry practices and no less stringent than those used to protect the Confidential Information of NCO.

(c)     As part of its information security program, NCO shall take appropriate measures to properly dispose of Borrower Data. These measures will include, at a minimum:

i.      Burning, pulverizing or shredding of papers containing Borrower Data so that the Borrower Data cannot practicably be read or reconstructed;

ii.     Ensuring the destruction or erasure of electronic media containing Borrower Data so that the Borrower Data cannot practicably be read or reconstructed; and/or

iii.    Ensuring that any third party who performs the activities described in (i) and (ii) on behalf of NCO above does so in a manner consistent with this Section.

(d)     NCO shall ensure that it does not retain Confidential Information of Special Servicer for longer than it needs such information to perform its obligations hereunder. NCO's disposal policy shall require that such information is reviewed and destroyed on a routine basis consistent with NCO's disposal policy. NCO shall, upon the reasonable request of Special Servicer, provide to Special Servicer the certificate of destruction as prescribed by Special Servicer. It is understood that information sent in an intangible or electronic format cannot be removed, erased or otherwise deleted from archival systems (also known as "computer or system back-ups") but that such information will continue to be protected under the confidentiality requirements contained in this Agreement for as long as such information remains accessible and/or vulnerable to unauthorized access use or disclosure. Notwithstanding anything to the contrary contained herein, NCO may retain an archival copy of any document for its permanent records to the extent required by applicable law or regulation of NCO's document retention policy. The rights and obligations of the parties under this Agreement will survive any return or destruction of Confidential Information.

(e)     NCO shall have in place and follow a routine destruction policy for all Confidential Information of Special Servicer (whether in electronic, paper or other form) related to NCO's performance under this Agreement. No such materials will be retained longer than such period as is set forth in NCO's policy period for retention unless mandated under this Agreement or by applicable law.

7.5    Security Breach.  In the event NCO knows or reasonably believes that there has been any unauthorized acquisition of or access to data that compromises the security, confidentiality, or integrity of Borrower Data maintained by or for NCO (a "Breach"), NCO shall take the following actions:

(a)    Notify Special Servicer of such breach as soon as practicable;

(b)    Identify to Special Servicer, at no cost to Special Servicer, what specific Borrower Data, by borrower and/or account number has or may have been breached;

(c)    Monitor, or cause to be monitored at NCO's sole expense, any affected accounts for any unusual activity for a period of 12 months from the discovery of the breach;

(d)    Take such commercially reasonable measures, at the sole cost of NCO, as may be requested by the Special Servicer to contain and control the incident to prevent further unauthorized access;

(e)    Remedy the circumstances that permitted such breach to occur; and

(f)    Cooperate with Special Servicer as necessary to facilitate Special Servicer's compliance with any applicable Federal or state law regarding unauthorized access of Borrower Data.

In addition to and not by way of limitation of any and all damages for which NCO is or may become obligated under this Agreement to pay to owner (i.e., the applicable Trust), NCO shall fully reimburse Special Servicer for the actual costs of mailing notices to individuals whose data has or may have been breached, to the extent such breach is the result of NCO's breach of this Agreement, NCO's failure to conform to applicable law, or NCO's negligence.

The obligations contained in this Section 7.5 shall survive the termination of this Agreement.

**ARTICLE VIII - INDEMNIFICATION AND EXCLUSION**

8.1    Indemnity.

(a)    NCO shall defend, indemnify and hold harmless Special Servicer and the applicable Trust, or any affiliate or subsidiary of Special Servicer or any Trust (each an "Special Servicer Indemnified Party") from and against any and all damages arising out of or resulting from third party claims relating to (i) the breach of any representation or warranty, covenant or agreement of NCO contained in this Agreement; (ii) any inaccurate information or inaccurate materials provided by NCO to Special Servicer in connection with providing the Services.  In addition, NCO shall reimburse Special Servicer for all costs incurred by Special Servicer resulting from third party investigation of the acts and practices of NCO, including expenses related to compliance with any third party subpoena or with any other discovery proceeding, if such investigation is due to the negligent act of NCO or breach of this Agreement by NCO.

(b)    NCO shall defend, indemnify and hold harmless each Special Servicer Indemnified Party from and against all damages arising out of or resulting from any action by a third party against such Special Servicer Indemnified Party that is based on any claim that any

intellectual property used in the performance of this Agreement infringes a patent, copyright, or trademark or violates a trade secret or other proprietary right of any person or entity.

(c)     Special Servicer shall defend, indemnify and hold harmless NCO or any affiliate or subsidiary of NCO (each a "NCO Indemnified Party") from and against all damages arising out of or resulting from any action by a third party against such NCO Indemnified Party that is based on any claim resulting from (i) the breach of any representation or warranty, covenant or agreement of Special Servicer contained in this Agreement; (ii) any information or materials provided by Special Servicer to NCO for use in providing the Services; or (iii) the nature or use of Special Servicer's products or services.  In addition, Special Servicer shall reimburse NCO for all costs incurred by NCO resulting from third party investigation of the acts and practices of Special Servicer, its subsidiaries and affiliates, including expenses related to compliance with any third party subpoena or with any other discovery proceeding.

(d)     An indemnified party which intends to claim indemnification under Section 8.1 shall promptly notify the indemnitor in writing of any action, claim or liability with respect to which the indemnified party intends to claim such indemnification.  The indemnified party shall permit the indemnitor, at its discretion, to settle any such action, claim or liability and agrees to the control of such defense or settlement by the indemnitor; provided, however, such settlement does not adversely affect the indemnified party's rights hereunder or impose any obligations on the indemnified party in addition to those set forth herein in order for it to exercise such rights.  No such action, claim or liability shall be settled without the prior written consent of the indemnitor and the indemnitor shall not be responsible for any attorneys' fees or other costs incurred other than as provided herein.  The indemnified party shall cooperate fully with the indemnitor and its legal representatives in the investigation and defense of any action, claim or liability covered by this indemnification.  The indemnified party shall have the right, but not the obligation, to be represented by counsel of its selection and expense

(e)     This provision shall not be construed to limit the rights, obligations, liabilities, claims or defenses of either party or any indemnified party which arise as a matter of law or pursuant to any other provision of this Agreement.

8.2     Exclusions from Liability.

(a)     Except as provided in this Article VIII, in no event shall NCO or Special Servicer be liable for consequential, incidental, punitive, special, or indirect damages.

(b)     Except as otherwise provided herein, neither party's liability hereunder shall exceed an amount equal to the service fees payable by Special Servicer to NCO in the month immediately preceding the claim to which such liability relates, multiplied by twelve (12).

(c)     The limitation of liability provisions of subsections 8.2(a) and 8.2(b) do not apply to liability that is the result of either party's breach of (i) the confidentiality, privacy, or security obligations or provisions contained in this Agreement or (ii) such party's indemnification obligations.

(d)     The limitation of liability provisions of subsections 8.2(a) and 8.2(b) also do not apply to any third party claim against an indemnified party arising out of the indemnifying party's failure to comply with the terms and conditions of this Agreement, if such claim results in such indemnified party being liable for consequential, incidental, special or indirect damages

to such third party.  Such damages will be considered to be direct damages incurred by the indemnified party.

The obligations set forth in this Article VIII shall survive termination or expiration of this Agreement.

## ARTICLE IX - TERM AND TERMINATION

9.1     Term of Agreement.

(a)     The initial term of this Agreement shall commence as of the Effective Date and shall continue in effect for a period of three (3) years, unless sooner terminated pursuant to Section 9.2 (the "Initial Term").

(b)     Upon conclusion of the Initial Term or any succeeding term, this Agreement shall automatically renew for an additional, successive one (1) year term, unless either party shall give a written notice of non-renewal to the other party not less than ninety (90) days prior to the conclusion of such term.

9.2     Termination for Cause.  Either party may terminate this Agreement upon the occurrence of any of the following events, by delivery of a written notice of termination to the other party:

(a)     NCO shall file, or after the Effective Date, Special Servicer shall file, a petition to take advantage of any applicable insolvency or reorganization statute; or shall file a petition or answer seeking or shall consent to the appointment of a conservator or receiver or liquidator in any insolvency, readjustment of debt, marshaling of assets and liabilities or similar proceedings of or relating to such party or relating to all or substantially all of its property; or a decree or order of a court or agency or supervisory authority having jurisdiction in the premises for the appointment of a conservator or receiver or liquidator in any insolvency, readjustment of debt, marshaling of assets and liabilities or similar proceedings, or the winding-up or liquidation of its affairs, shall have been entered against such party, which decree or order entered against such party shall have remained in force undischarged or unstayed for a period of sixty (60) days; or such party shall be insolvent, admit in writing its inability to pay its debts generally as they become due, make an assignment for the benefit of its creditors or voluntarily suspend payment of its obligations; or

(b)     Any other party shall fail to perform any of its obligations or shall breach any of its representations, warranties or covenants in this Agreement, including without limitation representations and warranties set forth in Article IV (Representations and Warranties), covenants set forth in Article V (General Covenants), or Article VII (Confidentiality), in any material respect and such failure or breach continues unremedied after the expiration of thirty (30) days (or such shorter period that is reasonable depending on the materiality of the failure or breach or the potential significance of its impact on the other party) following written notice to such party specifying the nature of such failure or breach and stating the intention of the terminating party to terminate this Agreement absent a cure of such failure or breach within such thirty (30) day (or shorter) period.

9.3     Termination of Specific Accounts.

(a)     Special Servicer may terminate this Agreement with regards to individual accounts at any time, and NCO shall close and return such accounts to Special Servicer immediately.

(b)     If a borrower should enter into bankruptcy voluntarily or involuntarily at any time after his or her account is referred to NCO, NCO will immediately notify Special Servicer and this Agreement will be deemed terminated as to such account unless Special Servicer otherwise directs in writing

(c)     With respect to default Collection Services, this Agreement shall terminate automatically as to any account at six (6) months from the date the account was referred to NCO, or from date of last payment, whichever is later, or nine (9) months on Third Placements, unless at such time the account has been referred to an attorney for litigation and litigation is pending. NCO will upon termination as to an account forthwith send to Special Servicer, at Special Servicer's request and at NCO's expense all documentation on the account, including a full record of all collection activities.

9.4     Rights and Obligations Upon Notice of Termination.

(a)     Requirements Upon Termination.  Upon the termination or expiration of this Agreement, NCO shall cease all Services and subject to the data security provisions in section 7.4 herein, return to Special Servicer or destroy all Confidential Information within thirty (30) days from the date of termination or as otherwise mutually agreed upon by the parties in writing.  Notwithstanding the foregoing, NCO shall be permitted to retain certain files pursuant to Section 6.1.  If applicable, NCO shall also provide to Special Servicer a final reconciliation of all amounts collected by Subservicers, collect all original files from Subservicers, and transmit all such files to Special Servicer.  NCO shall report to Special Servicer its record of all account balances of all ASLs that were the subject of Default Collection Services at the time of termination.

(b)     Survival.  The provisions of Sections 5.2, 9.4, Article VII, and Article VIII shall survive the termination or expiration of this entire Agreement.

(c)     Final Invoice. NCO shall send to Special Servicer a final invoice for Services performed within thirty (30) days of termination of this Agreement.

## ARTICLE X - DISASTER RECOVERY AND BUSINESS CONTINTUITY

10.1     NCO shall maintain and shall test at least once annually plans to continue business in the event of an interruption to its business or unavailability of any site from which Services are being performed (the "Disaster Recovery/Business Continuity Plans").  NCO agrees to maintain viable Disaster Recovery/Business Continuity Plans for the Services which includes, among other things, provision for the remote storage of computer software and data, the availability of a location for off-site computer services and procedures covering all of NCO's facilities used in connection with the Services in order to insure continuance of Services in the event of a disaster affecting any such NCO facility and storage of a complete system image tape of both object code and source code for software at an off-site storage location designated by NCO and disclosed to Special Servicer.  In the event of a natural or other disaster beyond NCO's control that interrupts NCO's performance of any such Services for any period, NCO shall promptly respond to such disaster in accordance with the procedures contained in the Disaster Recovery/Business Continuity Plans in order to resume performance of such Services.

10.2    NCO shall annually test its Disaster Recovery/Business Continuity Plans and shall update in a timely manner such Disaster Recovery/Business Continuity Plans. NCO shall provide Special Servicer with a summary report of the results of such testing annually. If Special Servicer requests, it shall be permitted to participate in NCO's testing of its Disaster Recovery/Business Continuity Plans to the extent such test relates to Services provided to Special Servicer.

10.3    Prior to execution of this Agreement, NCO shall provide a copy of its Disaster Recovery/Business Continuity Plans to Special Servicer (including in electronic form). Any material changes to NCO's Disaster Recovery/Business Continuity Plans will be subject to Special Servicer's prior written consent which shall not be unreasonably withheld and will conform to reasonable commercial and industry standards for such plans. Special Servicer, or its designated representative, shall be entitled to review such Disaster Recovery/Business Continuity Plans annually during the term of this Agreement at NCO's corporate headquarters.

10.4    Notwithstanding any provision in this Agreement to the contrary, NCO's Disaster Recovery/Business Continuity Plans required under this Agreement must meet Special Servicer's Recovery Time Objective ("RTO") and Recovery Point Objective ("RPO") for the business function being serviced, as defined below, unless events or circumstances beyond NCO's control prevent NCO from implementing its Disaster Recovery/Business Continuity Plans:

> Services will be available within a forty-eight (48) hour period following any outage/incident (RTO = 48 hours), with at least 99.99% preservation of data (RPO = 99.99) through the close of business on the day preceding the outage/incident.

10.5    NCO shall, as soon as practicable, notify Special Servicer of any interruption to NCO's business or unavailability of any site from which Services are being performed. As soon as possible (and in no event more than twenty-four (24) hours) following any such interruption or unavailability, NCO shall provide detailed information to Special Servicer concerning NCO's implementation of its Disaster Recovery/Business Continuity Plans, the effectiveness of such implementation, and the impact of the interruption or unavailability on the RTO, the RPO and the performance standards set forth in Exhibits B, D and H.

## ARTICLE XI - MISCELLANEOUS

11.1    Notice Procedure: Addresses. All notices, demands and other communications hereunder shall be in writing and shall be deemed to have been duly given and received at the time delivered by hand, if personally delivered; when receipt is acknowledged, if mailed by certified mail, postage prepaid, return receipt requested; the next business day after timely delivery to the courier, if sent by overnight air courier guaranteeing next-day delivery; and when received, if sent by any other means, as follows:

If to initial Special Servicer:

First Marblehead Education Resources, Inc.

Attn: General Counsel, Corporate Law Department

800 Boylston St., 34th Floor

Boston, Massachusetts 02199

If to NCO:

NCO Financial Systems, Inc.

Attn: Joshua Gindin, Esq.

Executive Vice President and General Counsel

507 Prudential Road

Horsham, Pennsylvania 19044

The persons or addresses to which mailings or deliveries shall be made may be changed from time to time by notice given pursuant to the provisions of this Section 11.1.

11.2    Mediation; Arbitration.  Except in the case of a third party action, the parties agree that any controversy or claim arising out of or related to this Agreement, including an alleged breach hereof, shall first be settled through negotiation, if possible.  If negotiation is not successful, the parties agree to then try in good faith to settle such dispute by non-binding mediation under the then current Commercial Mediation Rules of the American Arbitration Association.  In the event that such mediation does not resolve the dispute to the mutual satisfaction of the parties, then the parties agree to settle such dispute by binding arbitration to be held in Cincinnati, Ohio, in accordance with the then current Commercial Arbitration Rules of the American Arbitration Association, and judgment upon the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof.

11.3    Press Releases.  No party shall issue any press release or other announcement regarding the subject matter of this Agreement without the consent of the other party, which consents shall not be unreasonably withheld, unless a party refuses to consent and the party desiring to issue the release or other announcement is advised by its legal counsel that the press release or other announcement is required in order to comply with Requirements of Law.  Notwithstanding the foregoing, the parties contemplate that a press release regarding the execution of this Agreement may be executed, and the parties shall cooperate with respect to the drafting of mutually acceptable language.

11.4    Relationship of the Parties.  The parties agree that in carrying out their responsibilities pursuant to this Agreement they are in the position of independent contractors.  This Agreement is not intended to create, nor does it create and shall not be construed to create, a relationship of partners or joint venturers, fiduciaries or any association for profit between and among the parties or any of their respective affiliates.

NCO acknowledges that it may not be the exclusive collector for Special Servicer and that Special Servicer, in the exercise of its sole discretion, may submit the accounts to more than one collector (but not the same account to different collectors) in a specific geographic location.  Special Servicer, in the exercise of its sole discretion, likewise may by oral or written notice,

require NCO to cease its collection efforts and return to Special Servicer any or all of the accounts.

11.5   Expenses.  Except as is otherwise specifically provided in this Agreement, each party shall pay its own costs and expenses in connection with this Agreement and the transactions contemplated hereby, including but not by way of limitation, all regulatory fees, attorneys' fees, accounting fees and other expenses.

11.6   Successors and Assigns.  All terms and provisions of this Agreement shall be binding upon and shall inure to the benefit of Special Servicer and NCO, and each of their respective permitted transferees, successors and assigns.  Except as set forth in this Agreement, no party may assign any of its rights or obligations under this Agreement (whether by operation of law or otherwise) without the prior written consent of the other party; *provided, however*, that no prior written consent of the other party is required in the event that (a) Special Servicer experiences a merger or consolidation with or into or a reorganization between and among the wholly-owned subsidiaries of its ultimate parent company, or (b) Special Servicer seeks to assign this contract to any operating subsidiary.  Nothing in this Agreement is intended to create or grant any right, privilege or other benefit to or for any person or entity, other than the parties hereto and their permitted transferees, successors or assigns.

Notwithstanding the foregoing, the parties hereto acknowledge that U.S. Bank as the Back-Up Special Servicer under the Special Servicing Agreement is an express third-party beneficiary of this Agreement and that upon the Effective Date, the Back-Up Special Servicer as successor Special Servicer under the Special Servicing Agreement shall become the "Special Servicer" under this Agreement.  It is further acknowledged and agreed that fees, expenses and other amounts payable to NCO under this Agreement, including without limitation, indemnity payments, shall be payable by the Trusts as provided in the Special Servicing Agreement.  U.S. Bank as Special Servicer shall not be personally liable for payment of any such indemnity, indebtedness, fees or expenses (except to the extent it is reimbursed for same by each Trust).

11.7   Multiple Counterparts.  This Agreement may be executed in multiple counterparts, each of which shall be deemed an original for all purposes and all of which shall be deemed, collectively, one agreement, but in making proof hereof it shall not be necessary to exhibit more than one such counterpart.

11.8   Drafting.  Each party acknowledges that its legal counsel participated in the drafting of this Agreement.  The parties hereby agree that the rule of construction that ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement to favor one party over any other.

11.9   Captions.  The captions, headings and arrangements used in this Agreement are for convenience only and do not in any way affect, limit or amplify the terms and provisions hereof.

11.10   Entire Agreement; Amendments.  The making, execution and delivery of this Agreement by the parties have been induced by no representations, warranties, statements or agreements other than those herein expressed.  This Agreement embodies the entire understanding of the parties, and there are no further or other agreements or understandings, written or oral, in effect among the parties relating to the subject matter hereof.  This Agreement may be amended or modified only by a written instrument signed by each of the parties and,

prior to the Effective Date, with the consent of the Back-Up Special Servicer. None of the parties shall be deemed to have waived any of its rights, powers or remedies under this Agreement unless such waiver is approved in writing by an authorized representative of the waiving party.

11.11 _Waivers_. The waiver of any term hereof shall be binding only when committed to writing and signed by the parties hereof. Failure by either party of this Agreement to insist upon the strict performance of any term or condition hereunder or to exercise any right, power or remedy available on a breach thereof, shall not constitute a waiver of any breach of such term, covenant or condition. No waiver, whether express or implied, shall be construed as a waiver of the same or any other term, condition or right or any other occasion.

11.12 _Severability_. Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable Requirements of Law, but if any provision of this Agreement is held to be prohibited by or invalid under applicable Requirements of Law, such provision will be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

11.13 _GOVERNING LAW_. THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF OHIO, WITHOUT GIVING EFFECT TO ANY CHOICE OR CONFLICT OF LAW PROVISION OR RULE THAT WOULD CAUSE THE APPLICATION OF LAWS OF ANY JURISDICTION OTHER THAN TO THOSE OF THE STATE OF OHIO. EACH PARTY WAIVES ITS RIGHT TO A JURY TRIAL WITH RESPECT TO ANY ACTION OR CLAIM ARISING OUT OF ANY DISPUTE IN CONNECTION WITH THIS AGREEMENT, ANY RIGHTS OR OBLIGATIONS HEREUNDER OR THE PERFORMANCE OF ANY SUCH RIGHTS OR OBLIGATIONS.

11.14 _Force Majeure_. In the event that either party shall be prevented from performing any of its obligations due under the terms of this Agreement by an act of God, acts of war, civil riot, an act of State, strikes, or occurrence of any other event beyond the control of the parties hereto, that party shall be excused from any further performance of the obligations and undertakings set forth under the terms of this agreement with the exception of those obligations described in Articles III, VII, VIII, X, and Sections 5.2, 11.2, and 9.4(b), and provided, further, that NCO could not reasonably circumvent the failure orderly through the use of commercially reasonable alternate services, unrevoked plans or other means. Notwithstanding any provision is this Agreement to the contrary, a force majeure event shall obligate and require NCO to commence its Disaster Recovery/Business Continuity Plan as set forth in Article X.

11.15 _Cooperation/Consents_. The parties agree to cooperate with each other for the purposes contemplated by this Agreement. NCO shall execute and deliver to Special Servicer at any time such further documents, instruments and/or consents which Special Servicer may require in such form as Special Servicer may reasonably request to effectuate the performance of the Services contemplated by this Agreement.

[Remainder of page intentionally left blank.]

**IN WITNESS WHEREOF**, the parties have executed and delivered this Agreement, as of the day and year first above written, to be effective as of the Effective Date.

FIRST MARBLEHEAD EDUCATION RESOURCES, INC.

By: _Peter Flynn_

Its: _TREASURER_

NCO FINANCIAL SYSTEMS, INC.

By: _____

Its: _____

IN WITNESS WHEREOF, the parties have executed and delivered this Agreement, as of the day and year first above written, to be effective as of the Effective Date.

FIRST MARBLEHEAD EDUCATION RESOURCES, INC.

By: _____

Its: _____


NCO FINANCIAL SYSTEMS, INC.

By: _____

Its: Executive Vice President _____

Date: 3-10-09 _____

**SECOND AMENDMENT TO**
**DEFAULT PREVENTION AND COLLECTION SERVICES AGREEMENT**

This Second Amendment to Default Prevention and Collection Services Agreement (this "Amendment") is entered into by and between First Marblehead Education Resources, Inc. ("FMER"), a Delaware corporation with a principal place of business at 800 Boylston St., 34th Floor, Boston, MA 02199 (together with its successors and assigns, the "Special Servicer") and NCO Financial Systems, Inc., a corporation organized under the laws of the Commonwealth of Pennsylvania having a place of business at 507 Prudential Road, Horsham, PA 19044 (together with its successors and assigns, "NCO"), and amends that certain Default Prevention and Collection Services Agreement entered into by and between FMER and NCO and dated as of March 1, 2009, as amended by that certain First Amendment to Default Prevention and Collection Services Agreement entered into by and between FMER and NCO and dated as of May 1, 2009 (as amended, restated, supplemented or otherwise modified through the date hereof, the "Agreement"). This Amendment is executed as of June 15, 2012.

NOW, THEREFORE, in consideration of the premises set forth above, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1.      <u>Defined Terms</u>.  All capitalized terms in this Amendment shall have the same meanings given to them in the Agreement, unless otherwise expressly stated herein.

2.      <u>Amendments of the Agreement</u>.  The Agreement is hereby amended in the following respects:

2.1      The Agreement is amended by deleting each and every reference therein to "Early Awareness Services."

2.2      Section 1.1 of the Agreement is amended by deleting the definition of "Early Awareness Services." Section 1.1 of the Agreement is further amended by inserting the following definitions:

> ""Claims Package" means a credit agreement or promissory note."

2.3      The third sentence of Section 2.1 of the Agreement is amended by deleting the phrase "Servicing Agreement" and inserting "Special Servicing Agreements" in lieu thereof.

2.4      Section 2.3 of the Agreement is amended by deleting the third sentence in its entirety and the following shall be inserted in lieu thereof:

> "Special Servicer shall cause the Servicers to provide to NCO all documents and information specified in the Servicing Agreements and/or Servicing Guidelines."

2.5      Section 2.3(a)(i) of the Agreement is hereby deleted in its entirety and the following shall be inserted in lieu thereof:

> "[Reserved]"

2.6      The first sentence of Section 2.3(a)(i)(iii) of the Agreement is amended by deleting the phrase "with a Claims Package" so that the first sentence of Section 2.3(a)(iii) of the Agreement reads, in its entirety, as follows:

"From time to time Special Servicer may instruct NCO with respect to collection costs, default interest rates and other adjustments to be made to account balances submitted pursuant to Special Servicer's direction by Servicers to NCO ("Default Charges")."

2.7     Section 2.4 of the Agreement is amended by deleting the third sentence in the second paragraph in its entirety.

2.8     Section 2.4(e) of the Agreement is hereby deleted in its entirety and the following shall be inserted in lieu thereof:

"Settlement authority given to NCO is described in Exhibit D attached hereto. Special Servicer agrees to designate a business contact with authority to review and approve collection settlement proposals with NCO."

2.9     Section 2.8 of the Agreement is hereby deleted in its entirety and the following shall be inserted in lieu thereof:

"[Reserved]"

2.10    Article II of the Agreement is amended by inserting a new Section 2.9 in between Section 2.8 and Section 2.10 as follows:

"2.9    [Reserved]"

2.11    Section 4.1(a) of the Agreement is amended by deleting the phrase "a national banking association organized, validly existing and in good standing under the laws of the United States" and inserting "a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware" in lieu thereof.

2.12    Section 5.2(b)(vii) is amended by deleting the phrase "Paragraph 23(a)" and inserting "Section 5.2(b)" in lieu thereof.

2.13    Section 9.1 of the Agreement is hereby deleted in its entirety and the following shall be inserted in lieu thereof:

"(a)    The initial term of this Agreement shall commence as of the Effective Date and shall continue in effect for a period of one (1) year, unless sooner terminated pursuant to Section 9.2 (the "Initial Term").

(b)     Upon conclusion of the Initial Term or any succeeding term, this Agreement shall automatically renew for an additional, successive one (1) year term, unless (i) either party shall give written notice of non-renewal to the other party not less than ninety (90) days prior to the conclusion of such term or (ii) sooner terminated pursuant to Section 9.2.

(c)     Upon conclusion of the Initial Term, Special Servicer may terminate this Agreement at any time by providing thirty (30) days prior written notice to NCO.

2.14    Section 11.6 of the Agreement is amended by deleting the first paragraph in its entirety and the following shall be inserted in lieu thereof:

"All terms and provisions of this Agreement shall be binding upon and shall inure to the benefit of Special Servicer and NCO, and each of their respective permitted transferees, successors and assigns. NCO may not assign any of its rights or obligations under this

Agreement (whether by operation of law or otherwise) without the prior written consent of Special Servicer. Special Servicer may assign any of its rights or obligations under this Agreement (whether by operation of law or otherwise) without the prior written consent of NCO. Nothing in this Agreement is intended to create or grant any right, privilege or other benefit to or for any person or entity, other than the parties hereto and their permitted transferees, successors or assigns."

2.15     The Table of Exhibits to the Agreement is amended by deleting such table in its entirety and the following shall be inserted in lieu thereof:

> "Exhibit A –Servicer File Data – Default Prevention
> Exhibit B – Default Prevention Services
> Exhibit C – Default Prevention Reports
> Exhibit D – Default Collection Services
> Exhibit E – Default Collection Reports
> Exhibit F – Bankruptcy Services
> Exhibit G – [Reserved]
> Exhibit H – Fees to NCO
> Exhibit I – Trusts"

2.16     Exhibit A to the Agreement is amended by deleting the last sentence on Exhibit A in its entirety.

2.17     Exhibit B to the Agreement is hereby deleted and replaced in its entirety with the form of Exhibit B attached to this Amendment.

2.18     Exhibit C to the Agreement is amended by deleting "120" and inserting "180" in lieu thereof.

2.19     Exhibit D to the Agreement is hereby deleted and replaced in its entirety with the form of Exhibit D attached to this Amendment.

2.20     Exhibit F to the Agreement is hereby deleted and replaced in its entirety with the form of Exhibit F attached to this Amendment.

2.21     Exhibit G to the Agreement is hereby deleted in its entirety and the following shall be inserted in lieu thereof:

> "[Reserved]"

2.22     Exhibit H to the Agreement is hereby deleted and replaced in its entirety with the form of Exhibit H attached to this Amendment.

2.23     The Agreement is hereby amended by inserting a new Exhibit I in the form of Exhibit I attached to this Amendment.

3.     <u>Effect of Amendment</u>. This Amendment shall be effective as of the date first set forth above. Except as expressly amended in this Amendment, all terms and provisions contained in the Agreement shall continue in full force and effect, without modification.

4.     <u>Multiple Counterparts</u>. This Amendment may be executed in multiple counterparts, each of which shall be deemed an original for all purposes and all of which shall be deemed, collectively, one agreement, but in making proof hereof it shall not be necessary to exhibit more than one such counterpart.

Delivery of an executed counterpart of this Amendment by facsimile or pdf electronic transmission shall be deemed as effective as delivery of an originally executed counterpart.

5. <u>GOVERNING LAW</u>. THIS AMENDMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF OHIO, WITHOUT GIVING EFFECT TO ANY CHOICE OR CONFLICT OF LAW PROVISION OR RULE THAT WOULD CAUSE THE APPLICATION OF LAWS OF ANY JURISDICTION OTHER THAN TO THOSE OF THE STATE OF OHIO. EACH PARTY WAIVES ITS RIGHT TO A JURY TRIAL WITH RESPECT TO ANY ACTION OR CLAIM ARISING OUT OF ANY DISPUTE IN CONNECTION WITH THIS AGREEMENT, ANY RIGHTS OR OBLIGATIONS HEREUNDER OR THE PERFORMANCE OF ANY SUCH RIGHTS OR OBLIGATIONS.

[Remainder of page intentionally left blank]

IN WITNESS WHEREOF, the parties hereto have caused this First Amendment to the Default Prevention and Collection Services Agreement to be executed as of the date first written above.

FIRST MARBLEHEAD EDUCATION RESOURCES, INC.

By: _____
Name: Seth Gelber
Title: President


NCO FINANCIAL SYSTEMS, INC.

By: _____
Name: John R. Schwab
Title: Executive Vice President

IN WITNESS WHEREOF, the parties hereto have caused this First Amendment to the Default Prevention and Collection Services Agreement to be executed as of the date first written above.

FIRST MARBLEHEAD EDUCATION RESOURCES, INC.

By:_____
Name: Seth Gelber
Title: President


NCO FINANCIAL SYSTEMS, INC.

By:_____
Name: John R. Schwab
Title: Executive Vice President