IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| JAMES T. SNARR,<br><br>Plaintiff,<br><br>v.<br><br>TRANSWORLD SYSTEMS, INC., and NATIONAL COLLEGIATE STUDENT LOAN TRUST 2006-3,<br><br>Defendants. | **MEMORANDUM DECISION AND ORDER**<br><br>Case No. 2:21-cv-3<br><br>Howard C. Nielson, Jr.<br>United States District Judge |

Plaintiff James Snarr sued the National Collegiate Student Loan Trust 2006-3 and Transworld System, Inc. (whom the parties frequently refer to as TSI), on behalf of himself and a putative class of similarly situated individuals, asserting claims for (1) civil conspiracy to violate the Utah Consumer Sales Practices Act; (2) violation of the Fair Debt Collection Practices Act; (3) "Injunctive Relief"; and (4) invasion of privacy/intrusion upon seclusion. Dkt. No. 2 ¶¶ 80–109.[1] Defendants moved to dismiss the claims and the court converted TSI's motion to a motion for summary judgment pursuant to Federal Rule of Civil Procedure 12(d). For the following reasons, the court grants summary judgment in TSI's favor and dismisses the claims against the Trust.

---

[1] The complaint begins at page 11 of Dkt. No. 2. Paragraph citations to this docket entry reference paragraphs of the complaint.

Mr. Snarr also sued U.S. Bank, but later voluntarily dismissed his claims against this defendant. *See* Dkt. No. 62. Mr. Snarr also clarified that his claim under the Fair Debt Collection Practices Act was asserted only against TSI and stipulated to the dismissal of his claim for "Injunctive Relief." *See* Dkt. No. 32 at 18.

I.

On December 3, 2019, the Trust sued Mr. Snarr in Utah state court. *See* Dkt. No. 2 ¶ 38. The Trust is an investment vehicle "engaged in the practice of buying large numbers of education-related consumer loans and collecting payments from the borrowers for the benefit of investors." *Id.* ¶ 32. At the time of the suit, TSI operated as the default loan servicer for the Trust. *See id.* ¶¶ 6, 25. In the collection action, the Trust alleged that Mr. Snarr was delinquent on a loan owned by the Trust, which it had obtained through a consolidated loan pool purchase. *See id.* ¶ 39. To support these allegations, the Trust submitted an affidavit signed by Aaron Motin, a TSI employee. *See id.* ¶ 41.

In his affidavit, Mr. Motin represented that he had personal knowledge of the loan records, that the loan had an outstanding principal balance, and that the "loan had been transferred, sold, and assigned" to the Trust. Dkt. No. 28-5 at 2–5. Mr. Motin further stated that he was authorized to make these representations. *Id.* at 2. The affidavit purported to incorporate several exhibits, including Exhibit B, a "Credit Agreement/Promissory Note" and "Note Disclosure Statement" signed by Mr. Snarr; and Exhibit C, the "Pool Supplement" and the "Roster"—a redacted excerpt of the complete loan schedule that accompanied the Pool Supplement—which purportedly showed that the Trust had purchased the loans comprising the "pool" and that Mr. Snarr's loan was among these loans. *Id.* at 4.

None of these exhibits was actually attached to the Motin Affidavit when it was filed in the state court case, however, and Mr. Snarr alleges that no documents establishing the Trust's ownership of his loan were ever submitted in that case. Regardless, Mr. Snarr failed to appear in state court or otherwise defend against the Trust's suit and that court accordingly entered default judgment against him.

Mr. Snarr then initiated this suit, alleging that Defendants are unable to prove ownership of his loan and therefore engaged in "unfair, deceptive, and otherwise unconscionable debt collection practices" when they sued him to collect on that loan in state court. Dkt. No. 2 ¶ 2(d). Defendants removed the case to federal court, asserting both federal question jurisdiction and minimum diversity jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d). *See id.* at 3–4. Defendants then moved to dismiss the complaint for failure to state a claim. Among other things, TSI asserted that the missing exhibits do in fact exist and attached them to its motion to dismiss. *See* Dkt. No. 28-5. TSI also attached the complete loan schedule that accompanied the Pool Supplement and from which the Roster was excerpted. *See* Dkt. No. 28-6.

On September 20, 2021, the court heard arguments on the motions. The court recognized that "that the crux of plaintiff's claims is that the Motin affidavit is false and fraudulent because the exhibits it references do not exist, and that Transworld has falsified similar documents in other cases." Dkt. No. 54 at 54. Thus, according to Mr. Snarr, "the defendants cannot establish that they own the loan in question" and "[t]his alleged wrongdoing forms the basis of plaintiff's conspiracy, FDCPA, and intrusion upon seclusion claims." *Id.* Counsel for Mr. Snarr agreed that if the documents proffered by TSI were legitimate, he would not have a case. *See id.* at 25. But Mr. Snarr further argued that the documents submitted by TSI were "not the actual exhibits" that had accompanied the sales agreements through which the Trust claims it ultimately obtained his loan and that he could "show that these are not the original documents that they claim to be." *Id.* at 25–26.

Because Mr. Snarr contested the authenticity of these exhibits, and because the exhibits apparently would, if authentic and admissible, dispose of Mr. Snarr's claims, the court converted the motion to dismiss to a motion for summary judgment pursuant to Federal Rule of Civil

3

Procedure 12(d). *See id.* at 56. As required by this Rule, the court offered Mr. Snarr "a reasonable opportunity to test and possibly challenge the authenticity and accuracy of Transworld's exhibits, specifically these . . . attachments, if [he] wishes to do so or otherwise to argue that these exhibits do not dispose of his claims." *Id.* at 57.

The court then entered a stipulated discovery scheduling order on October 14, 2021. *See* Dkt. No. 61. The order provided for "limited discovery regarding the accuracy or authenticity of the loan schedule . . . and, by extension, the printed excerpt of the loan schedule" *Id.* at 1. The order further permitted Mr. Snarr to take a single one-hour deposition and to request five interrogatories and a single admission. *Id.* at 2.[2] Finally, the parties were ordered to file supplemental briefs after discovery was completed "address[ing] the authenticity or accuracy of the loan schedule/schedule excerpt." *Id.* at 6.

The parties filed three status reports detailing the progress of the limited discovery. The first status report, filed November 29, 2021, informed the court that TSI had provided responses to Mr. Snarr's interrogatories, requests for production, and request for admission. *See* Dkt. No. 64 at 1. On January 14, 2022, the parties represented that Mr. Snarr was working with his expert to address TSI's proposed protocol for inspecting the electronic loan schedule and that Mr. Snarr's expert would "forensically examine the file" once the parties agreed on an appropriate protocol. Dkt. No. 65 at 1. The final report was filed on April 1, 2022. The report explained that

---

[2] The interrogatories were limited to "Who created the loan schedule file represented by Exhibit 1 to the Bradley Luke affidavit at Dkt. 28-6, PageID.551 through PageID.816 (the 'Source File')?"; "When was the Source File created?"; "How was the Source File created?"; "How was the Source File transmitted to TSI?"; and "Who has knowledge of the above?" Dkt. No. 61 at 2. And the admission requested TSI to acknowledge that "the loan schedule excerpt attached to the Aaron Motin affidavit prepared in connection with the underlying collection case (Dkt. 28-5, PageID.513) is based on the loan schedule file represented by Exhibit 1 to Bradley Luke's affidavit (Dkt. 28-6, PageID.551 through PageID.816)." *Id.*

Mr. Snarr "has decided not to proceed with an inspection of the loan schedule source file" or to complete the "fact deposition of TSI's corporate representative"—meaning that limited discovery was now complete. Dkt. No. 66 at 1. The parties then filed supplemental briefs and the court heard further argument on the converted motion.

## II.

Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A fact is material if it "might affect the outcome of the suit under the governing law"; a "dispute about a material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). While "[t]he evidence of the non-movant is to be believed, and all justifiable inferences" "drawn in his favor," *id.* at 255, "[u]nsubstantiated allegations carry no probative weight in summary judgment proceedings," *McCoy v. Meyers*, 887 F.3d 1034, 1044 (10th Cir. 2018) (quotation omitted).

## III.

This case turns on two issues: whether the Roster—or the loan schedule from which it was purportedly derived—is authentic and establishes the Trust's ownership of Mr. Snarr's loan and whether the Roster or the loan schedule could be admitted as evidence at trial. Counsel for Mr. Snarr conceded at oral argument that if court concludes that the loan schedule or the Roster is both authentic and admissible, those conclusions would foreclose all of his claims against TSI and the Trust. The court accordingly begins its analysis there.

### A.

Mr. Snarr first argues that the Pool Supplement expressly transferred the "*Bank One* Loans described in Schedule 1" and therefore could not have included his loan because it is a *Chase Bank* loan. Dkt. No. 70 at 11 (cleaned up). And Mr. Snarr's loan agreement does state that his loan is a "Education One Undergraduate Loan" issued by JPMorgan Chase Bank, N.A. *See* Dkt. No. 28-5 at 10.

The Note Disclosure Statement, however, expressly indicates that Mr. Snarr's lender is "Bank One (JPMorgan Chase Bank N.A.)." *Id.* at 14. The Pool Supplement, an agreement dated September 28, 2006, further explains that the "Program Lender," "Bank One, N.A. (Columbus, Ohio) *by its successor by merger, JPMorgan Chase Bank N.A.*," agreed to "transfer[], sell[], set[] over and assign[] to The National Collegiate Funding LLC" each student loan set forth in the attached "Schedule 1 (the 'Transferred Bank One Loans')." *Id.* at 16 (emphasis added). These loans were in turn sold to The National Collegiate Student Loan Trust 2006-3. *See id.* at 23. This second transaction was effected through a "Deposit and Sale Agreement." *Id.* And Schedule A to that agreement explains that the transferred loans include those "originated under Bank One's . . . EDUCATION ONE Loan Program" that were the subject of the first agreement. *Id.* at 23, 29.

Critically, the "Roster"—which Mr. Motin represented in his affidavit is an excerpt of Schedule 1 to the Pool Supplement, *see id.* at 4—lists a single Bank One "Ed One – Undergraduate" loan that has the same loan number (03885764), last four social security number digits, date, and amount as those in Mr. Snarr's loan agreement and note disclosure statement. *Id.* at 10, 14, 21.

Uncontroverted record evidence thus demonstrates that Mr. Snarr's loan was included in the Pool Supplement transferring the student loans set forth in "Schedule 1" from JPMorgan

6

Chase Bank (Bank One's successor by merger) to The National Collegiate Funding LLC and also in the subsequent Deposit and Sale Agreement transferring those same loans from The National Collegiate Funding LLC to the Trust. That is sufficient to establish ownership.

Mr. Snarr attempts to avoid this conclusion by arguing that the "Roster" was created after the fact—meaning it "was not an exhibit to the Pool Supplement at the time of its signing"—and that there are "legitimate questions as to the Roster's authenticity and admissibility." Dkt. No. 70 at 12. And despite forgoing the opportunity to engage in much of the discovery into the authenticity and admissibility of the Roster previously offered him, Mr. Snarr boldly asserts that "[t]he facts can be further flushed out through discovery in this action." *Id.* at 3.

These arguments do not suffice to create a genuine dispute of material fact because TSI attached to its motion to dismiss Schedule 1—the complete loan schedule that *was* an attachment to the Pool Supplement at the time of signing. *See* Dkt. No. 28-6 at 3. And that document also includes a Bank One Ed One Undergraduate loan with the same loan number, last four social security number digits, date, and amount as those in Mr. Snarr's signed loan documents. *See id.* at 192.

Thus, even if there are questions about who created the "Roster" or when it was created, the actual loan schedule that was incorporated into the Pool Supplement and the subsequent Deposit and Sale Agreement expressly lists Mr. Snarr's loan. Mr. Snarr has not offered any evidence that the loan schedule is inauthentic or otherwise false. In fact, Mr. Snarr expressly declined the opportunity to forensically inspect that document despite initially expressing the desire to do so.

The court's conclusion that the two sale agreements and corresponding loan schedule are sufficient to establish ownership is consistent with Judge Jenkins's prior treatment of this issue in

*Taylor v. National Collegiate Student Loan Trust 2007-1*, 2021 WL 673458 (D. Utah Feb. 22, 2021). In that case, which also involved TSI, the plaintiffs argued that the loan schedule excerpt could not be trusted. *Id.* at *7.

There, the court explained the same two-step transaction and noted that the defendants had produced an excerpt of the loan schedule that included the last four digits of the plaintiff's social security number as well as the same loan number, amount, and date as those shown in his loan agreement. *Id.* at *4. The court had also previously ordered the defendants to produce the metadata for the complete loan schedule and noted that "Mr. Luke's affidavit states the schedule 1 excerpt 'was taken directly from the full schedule and the substance has not been altered in any way'" and that the plaintiffs did not depose him or contest the adequacy of the metadata until nearly six months after it was produced. *Id.* at *7–8. Judge Jenkins concluded that these facts were sufficient to establish that the plaintiff's loan was part of the pool acquired by the Trust.

As in *Taylor*, Mr. Snarr had the opportunity to depose TSI's corporate representative and to conduct a forensic analysis of the metadata for Schedule 1 but he declined to do so. *See* Dkt. No. 66 at 1. For this reason, as well as all of the other reasons discussed above, Mr. Snarr has failed to demonstrate that there is any genuine dispute of material fact regarding the Trust's ownership of his loan.

### B.

Mr. Snarr's final argument is that even if the Roster is authentic, it is not admissible as evidence. *See* Dkt. No. 70 at 13–15. Specifically, he argues that this document is hearsay and that TSI cannot lay an adequate foundation for its admission under the business-record exception because neither Mr. Motin nor Mr. Luke is familiar with the recordkeeping practices of the entity that created the loan schedule in the first place. *Id.* at 13.

8

Mr. Snarr's argument, however, is not supported by Federal Rule of Evidence 803(6). That rule explains that a "record of an act, event, condition, opinion, or diagnosis" is not excluded by the rule against hearsay if:

> (A) the record was made at or near the time by—or from information transmitted by—someone with knowledge; (B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit; (C) making the record was a regular practice of that activity; (D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and (E) the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.

FED. R. EVID. 803(6). As the committee notes to the 1974 enactment explain, "the scope of the phrase 'person with knowledge' is meant to be coterminous with the custodian of the evidence or other qualified witness." FED. R. EVID. 803(6) advisory committee's note to 1974 enactment. The "person with knowledge" language does not, however, require the proponent of the evidence to produce "the specific individual upon whose first-hand knowledge the memorandum, report, record or data compilation was based." *Id.*

It follows that "the sufficiency of the foundation witness' knowledge centers on the witness' familiarity with the organization's record keeping practices, not any particular record," WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 6863 (2022 ed.)—and specifically, the witness's familiarity with the record keeping practices *of the organization that has custody of the record in question*, see *Weinhoffer v. Davie Shoring, Inc.*, 23 F.4th 579, 583 (5th Cir. 2022).

Here, TSI offers Mr. Luke to lay the foundation for Schedule 1. Mr. Luke represented in his affidavit that he is "Director of Operations for Transworld," "the Subservicer and dedicated record custodian for [the Trust] with respect to defaulted educational loans serviced on behalf of the Trust." Dkt. No. 28-6 at 2. Mr. Luke further represents that his "statements . . . are based on personal knowledge of the business records that are kept and maintained by TSI on its own

9

behalf and as Subservicer and dedicated record custodian of the educational loans it services on behalf of the Trust" and that these records include "a schedule of loans identified in '2006-3 Pool Supplement; Bank One, N.A.' dated September 28, 2006" which is attached to his affidavit. *Id.* at 3.

Further, Mr. Motin stated in his affidavit that he is "competent and authorized to testify regarding [Mr. Snarr's] educational loan through [his] review of the business records maintained by TSI as custodian of records." Dkt. No. 28-5 at 2. He states that "[e]ducational loan records that are part of TSI's records are created, complied, recorded, and kept as part of regularly conducted business activity at or near the time of the event and from information transmitted by a person with personal knowledge." *Id.* at 3–4. Finally, Mr. Motin represented that Exhibit C contains "a true and correct copy of the Pool Supplement and a redacted excerpt of the Schedule of the Loan Pool described within the Pool Supplement showing that [Mr. Snarr's] loan was part of the Loan Pool." *Id.* at 4.

The court concludes that this testimony would suffice to lay a foundation for admitting Schedule 1 as a business record at trial. *See* FED. R. EVID. 104(a). This conclusion is consistent with Judge Jenkins's reasoning in *Taylor*. There, the defendants also offered Mr. Luke as their custodian of records but the plaintiffs argued that he was "not qualified to introduce the records because he was not a witness to the creation of them." 2021 WL 673458 at *7. Judge Jenkins rejected this argument, explaining that Mr. Luke "testified through affidavit that he is the designated records custodian for NCSLT, that TSI is the designated records custodian of Mr. Taylor's loan, [and] that Mr. Luke had personal knowledge of the business records maintained by TSI." *Id.*

Mr. Luke further represented "that the student loan records were 'created, compiled and recorded as part of a regularly conducted business activity at or near the time of the event and from information transmitted from a person with personal knowledge.'" *Id*. Judge Jenkins concluded that Mr. Luke's testimony "laid a sufficient foundation" to "satisf[y] the requirements of Rule 803(6)" and that "NCSLT's evidence of schedule 1 [was] admissible." *Id.*

The advisory committee notes make clear that once the proponent has established the requirements of the business record exception, "the burden is on the opponent to show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness." FED. R. EVID. 803(6) advisory committee's note to 2014 amendments. The court concludes that Mr. Snarr has failed to make such a showing. He declined to analyze the metadata of the loan schedule and acknowledged during argument that this document was created long before any of the litigation related to this case.

Instead, Mr. Snarr points to unrelated proceedings that he claims demonstrate that the loan schedule and Roster cannot be trusted. *See* Dkt. No. 70 at 6, 8–10. But having carefully reviewed Mr. Snarr's submission—most of which question the accuracy of TSI affidavits between 2013 to 2016, far before the state court action at issue here was filed against Mr. Snarr, *see* Dkt. No. 71-3 at 6; Dkt. No. 71-5 at 11–14; Dkt. No. 71-8 at 9–10; *cf.* Dkt. No. 71-2 at 20–22—the court finds them insufficient to call into question either the veracity of the declarations submitted by Mr. Luke and Mr. Motin in this case or the trustworthiness of the loan schedule.

\*   \*   \*

For all of these reasons, the court concludes that TSI has proffered uncontroverted evidence that would be admissible at trial establishing that the Trust owned Mr. Snarr's loan at

the time it initiated the collection action in state court. It follows that TSI is entitled to summary judgment.

## C.

Counsel for Mr. Snarr acknowledged at the summary judgment hearing that "probably nothing" would be left of his claims against the Trust if the court granted TSI's motion and that "as TSI goes, the Trust goes." *See* Dkt. No. 72 at 6:12–6:14, 6:32–34. The court agrees that its conclusions regarding the authenticity and admissibility of the Roster and loan schedule are fatal to all of Mr. Snarr's remaining claims.

First, Mr. Snarr's claim under the Fair Debt Collection Practices Act is premised on the theory that TSI falsely asserted that the loan schedule existed when it actually did not and that TSI could not produce evidence that the Trust actually owned his loan. Likewise, Mr. Snarr's claim under the Utah Consumer Sales Practices Act rests on the allegation that "[t]he Defendants have, amongst themselves, expressly or impliedly agreed to undertake unlawful debt collection efforts and/or violations of the Utah Consumer Sales Practices Act." Dkt. No. 2 ¶ 88. But this claim also hinges on TSI and the Trust's alleged inability to establish ownership of his loan.

The only allegation in the complaint that is not related to the missing documents is that the Trust is not licensed as a collection agency in the State of Utah. *See id.* ¶ 2(c). But Mr. Snarr also alleges that "[a]t all times relevant to this Complaint, Transworld has acted as the debt collector on behalf of the Trusts and Trusts expressly authorized Transworld to carry out all work that it has done on their behalf," and that "Transworld *is* a licensed Utah collection agency." *Id.* ¶¶ 6(d), 25 (emphasis added).

Finally, Mr. Snarr's invasion of privacy or intrusion upon seclusion claim cannot be based on the Defendants' actions to collect on a loan that the Trust lawfully owned. *See Stien v.*

12

*Marriott Ownership Resorts, Inc.*, 944 P.2d 374, 379 (Utah Ct. App. 1997); RESTATEMENT (SECOND) OF TORTS § 652B cmt. d, (AM. L. INST. 1977).

For all of these reasons, the court grants summary judgment in favor of TSI on all of Plaintiff's claims against TSI and dismisses all of Plaintiff's claims against the Trust.

**IT IS SO ORDERED.**

DATED this 6th day of July, 2022

Howard C. Nielson, Jr.
United States District Judge